IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| OSCAR BERMUDEZ | : | No. 05-044-15 |
| a/k/a "King Fat Joe" | : | |

## MEMORANDUM

PRATTER, J.                                                                          DECEMBER 14, 2020

Oscar Bermudez seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Bermudez requests relief based on the COVID-19 pandemic and his medical conditions that he believes place him at an increased risk of harm from the virus. The Government opposes Mr. Bermudez's motion, given the danger he presents to the community. For the following reasons, the Court denies the motion.

### BACKGROUND

**I.    Mr. Bermudez's Criminal Conduct**

Mr. Bermudez was a leader of the Latin Kings, a highly organized nationwide gang involved in violent crimes and drug trafficking. The network enforces discipline through a hierarchy of titles and a detailed punitive system. Mr. Bermudez served as the Fourth Crown (Treasurer) and Fifth Crown (Secretary) of the Philadelphia chapter of the Latin Kings gang. He personally participated in a drug trafficking conspiracy to distribute heroin in Philadelphia and a conspiracy to kidnap eight women.

In 2007, he was convicted of one count of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d), one count of conspiracy to distribute 1,000 grams

1

or more of heroin, in violation 21 U.S.C. § 846, and one count of conspiracy to kidnap in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5).

Mr. Bermudez is serving his sentence at Lompoc USP with an anticipated release date of July 25, 2026. He has served approximately 189 months and has earned nearly 25 months credit for good conduct. Thus, Mr. Bermudez has served roughly two-thirds of his sentence.

While incarcerated, he has incurred nine disciplinary sanctions, including for fighting, possessing unauthorized items (including drugs), abusing phone privileges, and refusing to obey orders. His most recent infraction was from May 2020.

## II.     Mr. Bermudez's Request for Compassionate Release and Medical Records

On March 24, 2020, Mr. Bermudez requested compassionate release from the warden of the facility where he is confined. The warden did not respond until June 16, 2020. Doc. No. 1090 at 629. Because more than 30 days passed following Mr. Bermudez's request to the warden, he satisfied 18 U.S.C.§ 3582(c)(1)(A)'s exhaustion requirement In October 2020, Mr. Bermudez filed this motion. He seeks relief based on his morbid obesity, related medical conditions, and fear of contracting COVID-19 while incarcerated.

Mr. Bermudez's medical records for the past year reveal that he is morbidly obese and has high blood pressure, asthma, sleep apnea, and hypothyroidism. His conditions are currently controlled with medication provided by the Bureau of Prisons ("BOP") where he is confined. He is reportedly ambulatory, although he occasionally uses a walker, and engages in all normal activities of daily living within the prison.

### III. BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[1] and it has taken significant measures to protect the health of the inmates in its charge. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.[2] The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a suspected outbreak overseas and further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential COVID-19 transmissions as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions nine months ago, in March of this year.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan permits only limited group gathering, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been suspended, as has most in-person staff training. BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved.

Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk

---

[1] BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Dec. 14, 2020).

[2] BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Dec. 14, 2020).

factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with the Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). In April 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of COVID-19 transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Mr. Bermudez currently lives at Lompoc USP. The Lompoc facility includes the penitentiary (USP), a federal correctional institution, and two camps. This facility was "one of the most infamous hotspots" in the country at the outset of the pandemic, *United States v. Hernandez*, No. 1:17-CR-0264 AWI SKO, 2020 WL 5203428, at *3 (E.D. Cal. Sept. 1, 2020). As of December

---

[3] This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

10, 2020, 13 inmates and one staff member are currently COVID-positive. Overall, at this facility, 137 inmates and 28 staff members were previously positive for COVID-19.[4]

Mr. Bermudez relies on case counts and reports which are now outdated. To be sure, the situation at Lompoc was dire earlier this year. And the Court neither minimizes nor is blind to Lompoc's initial response to the pandemic, including the shortage of medical staff, and ineffective screening, testing, and isolation protocols.[5] But multiple courts have found that, despite its earlier failures to contain the disease within its inmate population, Lompoc has since "implemented sufficient protocols that the prison is now able to adequately respond, monitor, and care for its inmates" during the pandemic. *United States v. Risley*, No. 1:12-CR-0363 AWI, 2020 WL 4748513, at *6 (E.D. Cal. Aug. 17, 2020) (collecting cases).

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). However, a defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[6] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

---

[4] The data is current as of December 14, 2020, according to the BOP website, available at https://www.bop.gov/coronavirus.

[5] In July, the Office of the Inspector General published its report following a remote inspection of Lompoc. Office of Inspector General, *Remote Inspection of Federal Correctional Complex Lompoc* (July 23, 2020), available at also https://oig.justice.gov/sites/default/files/reports/20-086_0.pdf (last visited Dec. 14, 2020).

[6] "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'" *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement,[7] a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[8] and that the § 3553(a) factors favor reduction. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

---

[7] The Government does not contest that Mr. Bermudez has met the exhaustion requirement.

[8] Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

## DISCUSSION

Without a doubt, all segments of our society have been experiencing the unprecedented magnitude of the COVID-19 pandemic. The Court certainly does not minimize the critical health risk posed by COVID-19. But as concerning as the current pandemic is, resolving Mr. Bermudez's motion still calls upon the Court to take into serious consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Mr. Bermudez argues that he should be immediately released under 18 U.S.C. § 3582(c)(1)(A)(i) given his morbid obesity, related medical conditions, and ethnicity.

Although COVID-19 is a dangerous, and sometimes lethal, virus for all individuals, the Centers for Disease Control and Prevention (CDC) has deemed certain people with specific underlying medical conditions and the elderly to be at a heightened risk of severe illness or death.[9]

---

[9] *See People at Increased Risk*, Centers for Disease Control and Prevention (Nov. 30, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Dec. 10, 2020).

"While this court is not bound by the CDC's guidelines, it follows suit with many other district courts who have turned to the guidance as reliably informative." *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (listing cases).

Mr. Bermudez's morbid obesity puts him at increased risk of severe illness from COVID-19. The CDC recognizes that adults who are obese—measured as a BMI of 30 or greater—are at increased risk. Mr. Bermudez's BMI is 61.9.[10] The Government concedes that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." *See* U.S.S.G. § 1B1.13 n.1.

In general, courts have been reluctant to grant compassionate release based solely on obesity. *See United States v. Williams*, No. 15-cr-471-3, 2020 WL 4756743, at *5 (E.D. Pa. Aug. 17, 2020) ("[O]besity during the age of the COVID-19 pandemic does not necessarily mean, on its own, that extraordinary and compelling reasons justify the reduction of his sentence."); *United States v. Grasha*, No. 18-cr-325, 2020 WL 5747829, at *5 (W.D. Pa. Sept. 24, 2020) (finding defendant's obesity and BMI of 48, while presenting a serious risk, did "not arise to an extraordinary and compelling reason for release"). But the Court does acknowledge that Mr. Bermudez's condition is definitely problematic.

Other than his morbid obesity, Mr. Bermudez's other medical conditions are not considered "high-risk." The CDC has recently revised its list of people with certain medical

---

[10] Mr. Bermudez states that he is over 500 pounds, so his BMI is now 64.2. Regardless of whether the Court accepts this number or the Government's, Mr. Bermudez's weight puts him at increased risk for severe illness from COVID-19.

8

conditions who "are at increased risk of severe illness" from COVID-19.[11] The CDC also lists several conditions where there "might be an increased risk for severe illness," but insufficient data exists to say more. High blood pressure, pre-diabetic conditions, asthma, sleep apnea and hypothyroidism fall into this "might" category.[12] They are not considered high-risk by the CDC.

Courts routinely deny motions for the extraordinary remedy of compassionate relief based on potential COVID-19 risk factors. *See, e.g.*, *United States v. Moldover*, No. CR 14-637, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (defendant's asthma, hypertension, and obesity did not constitute extraordinary and compelling reason for release); *United States v. Ackerman*, No. CR 11-740-KSM-1, 2020 WL 5017618, at *5 (E.D. Pa. Aug. 25, 2020) (compassionate release not warranted because "there is no there is no indication that the defendant's hypertension cannot be properly controlled via medication or other appropriate medical care"); *United States v. Daniels*, No. CR 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) ("hypertension does not warrant compassionate release").

Mr. Bermudez has not established that his medical conditions—although problematic—are not monitored and appropriately managed with medication at Lompoc. And although the Court is mindful of Mr. Bermudez's concerns about possible complications were he to contract COVID-19, the mere existence of COVID-19 and the possibility it may spread does not independently justify compassionate release. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

---

[11] *People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Dec. 1, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 14, 2020).

[12] Mr. Bermudez's medical records state that he has "unspecified essential" hypertension, a distinct diagnosis from the more severe pulmonary hypertension. The CDC recognizes only the latter as a "serious heart condition" that increases an individual's risk of severe illness from COVID-19. *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Dec. 1. 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 14, 2020).

Nor is it at all clear that being Hispanic increases Mr. Bermudez's risk of contracting COVID-19 while he is incarcerated and has access to medical treatment at the facility. To the extent that racial and ethnic minorities have disproportionately contracted COVID-19 and are overrepresented in hospitalizations and deaths, there is no evidence presented here that the reported statistical differences are based on a biological predisposition rather than possibly attributable to systemic economic and social issues. *United States v. Alexander*, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) ("[I]t is not clear that being African-American increases Defendant's risk of complications from [] COVID-19...."); Center for Disease Control and Prevention, Coronavirus Disease 2019 Racial & Ethnic Minority Groups, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fracial-ethnic-minorities.html (last visited Dec. 10, 2020). The Court cannot say that Mr. Bermudez's Hispanic roots are a medical condition that warrants compassionate release. *United States v. Mark*, 2020 WL 5801495, at *2 (E.D. Pa. Sept. 29, 2020).

The Court finds that Mr. Bermudez's physical conditions are problematic. And the Court, for purposes of this motion, will assume that Mr. Bermudez's morbid obesity presents an extraordinary and compelling reason for release. But the extraordinary relief he requests will be denied even though he is at increased risk. Consideration of the § 3553(a) factors compel this result.

Here, the Court imposed a 300-month sentence as a result of Mr. Bermudez's deliberate, serious and extensive membership and participation in the Latin Kings gang. As a leader of a violent drug organization, Mr. Bermudez trafficked drugs, participated in violent physical beatings, and conspired to kidnap eight women, all as part of a pattern of racketeering activity.

Mr. Bermudez's convictions were the most recent additions to an extensive criminal record. At sentencing, the Court was informed that he had five prior felony drug trafficking convictions and easily qualified as a career offender under the Sentencing Guidelines.

Mr. Bermudez has served 189 months, which is not yet 2/3 of his sentence. Moreover, the 300-month sentence represents a significant downward departure from a guideline range of 360 months to life imprisonment. The Court afforded Mr. Bermudez considerable leniency at sentencing and did not include additional Guidelines points for obstruction of justice, despite his false sworn testimony at his motion to withdraw his guilty plea. Nor did the Court refuse points for early acceptance of responsibility even when Mr. Bermudez refused to accept responsibility at the hearing to withdraw his guilty plea. Given these circumstances together with the seriousness of the offenses, early release is simply not appropriate.

Prior similar decisions of courts within this Circuit support the Court's analysis. *See, e.g.*, *United States v. Goode*, No. CR 10-177-02, 2020 WL 6445930 (E.D. Pa. Nov. 2, 2020) (denying release, notwithstanding health conditions when career offender had more than 55 months left on a 210-month drug sentence); *United States v. Ordaz*, 2020 WL 5993289 (E.D. Pa. Oct. 9, 2020) (denying release to 61-year old defendant with hypertension and hyperthyroidism who led a violent drug organization and had served less than two-thirds of a 420-month sentence); *United States v. Coleman*, 2020 WL 6334784 (W.D. Pa. Oct. 29, 2020) (denying release where more than two years remained on 92-month sentence for drug offenses, notwithstanding defendant's diabetes and obesity); *United States v. Horton*, No. 1:13-CR-16, 2020 WL 4473405 (M.D. Pa. Aug. 4, 2020) (denying release for defendant with 24 months remaining on a 140-month sentence when defendant had a 20-year record, including four prior drug convictions).

Mr. Bermudez has the burden of showing that a reduction in his sentence is warranted. In addition to emphasizing the risks posed by the pandemic, he points to his conduct while incarcerated, including his commitment to rehabilitation. The Court certainly commends Mr. Bermudez's efforts at rehabilitation, including earning his GED. But the Court takes notice that, despite his statements to the contrary, Mr. Bermudez has not actively distanced himself from the Latin Kings while incarcerated. Rather, a recent search of his cell reportedly revealed various photos and paraphernalia of the gang. This further signals to the Court that early release is not warranted.

Even if Mr. Bermudez presented a serious medical condition, the gravity of his crimes and the danger posed to the community warrant the sentence as imposed. *See United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (noting district court reasonably concluded early release not warranted where defendant's "crimes were extraordinarily serious" and required "a significant period of incarceration").

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Bermudez's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE